IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| OMAR WILLIAMS,<br>Institutional ID No. 2193254<br><br>Plaintiff,<br><br>v.<br><br>OLIVIA CAUDILLO, *et al.*,<br><br>Defendants. | §<br>§<br>§<br>§<br>§   CIVIL ACTION NO. 5:21-CV-106-BQ<br>§<br>§<br>§<br>§<br>§ |

## REPORT AND RECOMMENDATION

Proceeding pro se and *in forma pauperis*, Plaintiff Omar Williams filed this action under 42 U.S.C. § 1983, claiming violations of his constitutional rights during his incarceration at the Texas Department of Criminal Justice (TDCJ) Preston Smith Unit (Smith Unit). Compl. 1–2, 4–6, ECF No. 1.[1] Williams filed his Complaint on May 7, 2021, and the United States District Judge transferred this case to the undersigned United States Magistrate Judge for further proceedings. ECF Nos. 1, 8. The undersigned thereafter reviewed Williams's Complaint, as well as authenticated records from TDCJ, and ordered Williams to complete a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976).[2] ECF No. 10. Williams timely completed and returned the questionnaire. ECF No. 11.

After reviewing Williams's responses to the first questionnaire, the Court determined it needed additional information to properly screen the case and ordered Williams to complete a supplemental questionnaire, which he also timely completed and returned. ECF Nos. 16, 17.

---

[1] Page citations to Williams's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

[2] The Court did not find it feasible to hold a hearing in accordance with *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985) due to the COVID-19 pandemic.

Not all parties have consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned makes the following Report and recommends that the district judge order an answer or other pleading as to the following claims against: (1) Defendants Captain Richard Aynes, Lt. Olivia Caudillo, and Officer Oscar Espino for failure to protect; (2) Defendant Lt. Caudillo for retaliation; and (3) Defendants Lt. Caudillo and Captain Aynes for deliberate indifference to serious medical needs. Further, the undersigned recommends that the district judge dismiss with prejudice all other claims asserted by Williams in accordance with 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), excepting Williams's due process claim related to a November 17, 2020, disciplinary charge. As to that claim, the undersigned recommends the district judge dismiss it with prejudice until the conditions of *Heck v. Humphrey*, 512 U.S. 477 (1994) are met.

## I.  Standard of Review

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations,

2

responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire or testimony given during an evidentiary hearing are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II.   Discussion

### A.   Williams's claims and the authenticated records.

Williams asserts claims against the following Defendants, all TDCJ employees: (1) Lieutenant Olivia Caudillo; (2) Captain Richard Aynes; (3) Clerk Lisa Caudillo; (4) Correctional Officer (CO) Oscar Espino; (5) Assistant Warden Cody R. Parker; (6) Senior Warden Jimmy S. Webb; (7) Captain Corey J. Henry; (8) Major David S. Dyer; and (9) TDCJ Director Bobby Lumpkin.[3]  Compl. 4–5. The Court liberally construes Williams's Complaint and questionnaire responses to allege the following claims:  (1) failure to protect; (2) conspiracy;

---

[3] Williams originally named Lieutenant Charles B. Miller as a Defendant. Compl. 2, 4. In his supplemental questionnaire responses, however, Williams stated that he wishes to "terminate [his] claim against Lt. Miller." Suppl. Questionnaire 13, ECF No. 17. The Court therefore recommends dismissal of all claims against Lt. Miller.

(3) retaliation; (4) deliberate indifference to serious medical needs; (5) loss of personal property; (6) due process violations; (7) failure to follow institutional policy; and (8) supervisory liability. Williams's factual allegations are complex, and sometimes unclear. The Court therefore focuses on providing a summary of Williams's assertions in the following factual recitation.

Regarding his failure-to-protect claims, Williams alleges that on October 10, 2020, while housed on B-wing, he "was awakened by" his cellmate, Terrance Palmer, choking him. Questionnaire 28, ECF No. 11. According to Williams, Palmer "was extremely intoxicated from smoking synthetic marijuana," which led to the incident. *Id.* But prior to October 10, Williams and Palmer "had never had any disputes or arguments as cellmates." *Id.*

Williams asserts he "began fighting Palmer off . . . and calling for help." *Id.* Williams states that several officers arrived, including Lt. Caudillo, who "wrestled Palmer to the floor[,] . . . placed him into restraints," and moved Palmer to a different wing. *Id.* "Some hours later," however, Williams contends that "Lt. Caudillo returned to [his] cell with Palmer" and tried to place Palmer back in the cell. *Id.* Williams claims that he "adamantly objected to Palmer being placed back into the cell" and then struck a deal with Lt. Caudillo whereby Williams agreed to keep quiet about the incident in exchange for Caudillo assigning Williams to a different cell. *Id.* at 29. Thereafter, Lt. Caudillo apparently housed Williams on J-wing. *See id.*

Despite their purported agreement, Williams alleges that the following day, October 11, he filed a grievance "in reference to Lt. Caudillo's attempt to rehouse Palmer with [Williams] after" the assault. *Id.* Thereafter, on October 12, Williams claims that Lt. Caudillo handed him a "move-slip" that was signed by Clerk Caudillo,[4] ordered Williams to move back to B-wing, "and tried to have [Williams] move back into the cell with Palmer." *Id.*

---

[4] Williams believes that Clerk Caudillo "is either Lt. Caudillo's sister, or Lt. Caudillo's wife." Questionnaire 29; *see* Suppl. Questionnaire 4. Williams contends that Clerk Caudillo "routinely worked in the Classification office and

Williams concedes that he refused to comply with Lt. Caudillo's orders, "so Lt. Caudillo contacted [Clerk] Caudillo and told her to have [Williams] moved into another cell, but still on B-Wing where Palmer and his gang affiliated friends were housed." *Id.* According to Williams, "Palmer and his gang friends began to harass and threaten to assault [Williams]," causing Williams to become fearful to leave his cell when "Palmer and his friends" were located in the same areas. *Id.* Williams maintains that Palmer is a member of the Blood gang, while Palmer's friends are members of the Crips. Suppl. Questionnaire 8–9. *But see id.* at 2 (asserting that Palmer and "his friends" "were all in the same gang").

On October 19, a family member of Williams's purportedly contacted "the TDCJ Ombudsman's office and filed a life endangerment complaint" on Williams's behalf, which resulted in Major Dyer moving Williams to F-wing. Questionnaire 30. But apparently F-wing was not suitable for Williams, so his "wife contacted Warden Cody Parker," who directed Williams to be rehoused on B-wing on October 21 "pending an Offender Protection Investigation (OPI)." *Id.* Despite a pending OPI, Williams asserts that he never appeared before the Unit Classification Committee (UCC) and "was never interviewed by Safe Prisons/Prea Sgt.," "Gang-Intelligence Sgt.," or "the Office of the Inspector General[] (OIG)," as is required by TDCJ policy. *Id.* at 22, 30.

On October 21, Williams states that spoke with Captain Aynes and reported that his "life was in danger because Defendant Olivia Caudillo had labelled [Williams] with Palmer and his friends as a snitch, and that Palmer and his friends had threatened to assault [Williams] if [he] didn't move off B-Wing." *Id.* at 30. In response, Captain Aynes ostensibly assured Williams "he

---

acted in the capacity of a Classification officer"—i.e., her duties included "assign[ing] housing." Suppl. Questionnaire 4.

would take care of the situation" and directed Williams "not to move from the OPI cell unless [Williams] got direct orders from [Aynes] personally." *Id.*

On October 29, Williams asserts that "Lt. Caudillo, without having conducted a[n] OPI investigation according to TDCJ policy, came to [Williams's] cell and ordered [him] to pack [his] property and move to A-Wing." *Id.* Williams apparently told Lt. Caudillo that Captain Aynes had directed that Williams was not to move except upon Aynes's order. *Id.* Williams contends this prompted Lt. Caudillo to order another officer, Sgt. Sanchez (not named as a defendant), to issue two false disciplinary infractions for disobeying orders "just minutes apart." *Id.* Williams believes that the two disciplinaries are the result of Lt. Caudillo having Clerk Caudillo "change [Williams's] cell assignment twice within twenty minutes so that [Williams] could receive two disciplinary cases for not moving." *Id.*

Similarly, Williams avers that on November 17, Sgt. Atkinson (whom he does not name as a defendant) "fabricated two disciplinary cases," "falsely claiming [Williams] was on 'C-Wing' and that [Williams] refused to move." *Id.* Williams alleges that Sgt. Atkinson wrote the disciplinary cases "at the behest of Lt. Caudillo." *Id.*

Williams appeared for a disciplinary hearing on November 5 before Captain Corey Henry in regard to the October infractions. *Id.* at 24, 31. On December 15, Williams appeared at a disciplinary hearing for the November incidents. *Id.* at 26. Williams was found guilty of all charges, but he claims that both hearings did not comply with due process. *See id.* at 24–27.

In the following days, Williams or his family members made several other reports concerning Williams's safety. *See id.* at 31 (On November 11, Williams wrote a letter to the "State Office of Administrative Hearings," and on November 18, Williams's family again contacted the Ombudsman's office to file a life endangerment complaint.), 32 (stating that he "wrote multiple

letters requesting protection to Senior Warden Jimmy Webb, Assistant Warden Cody Parker, Major Dyer, [and] Director Bobby Lumpkin"). On approximately November 18, Captain Aynes allegedly moved Williams to A-wing, where Williams "was immediately threatened by friends of Palmer[']s." *Id.* at 31; *see* Suppl. Questionnaire 1 (relating that the inmates threatened to beat Williams's a** "for snitching on Palmer and Lt. Caudillo"). An officer not named herein overheard the threats and made a report. Questionnaire 31; Suppl. Questionnaire 2.

Thereafter, on November 19, Williams asserts that "Captain Aynes ordered [Williams] to . . . move to G-wing, which was a disciplinary wing." Questionnaire 32. Williams claims as soon as he arrived on the wing, Officer Espino "left his duty post in G-wing, leaving [Williams] in the dayroom with Palmer's friends."[5] *Id.* The inmates allegedly attacked Williams, beating him "with fists and feet." Suppl. Questionnaire 9. As a result of the attack, Williams contends he suffered injuries to his head, jaw, and ribs, and the inmates stole his personal property. *Id.*

Williams avers that the supervisory Defendants, including Major Dyer, Assistant Warden Parker, Senior Warden Webb, and Director Lumpkin failed to take appropriate measures to ensure his safety and prevent the November 19 assault. Questionnaire 18–21, 31–32. Moreover, Williams asserts that following the November 19 attack, he verbally asked Lt. Caudillo and Captain Aynes for medical treatment for the injuries to his head, jaw, and ribs that same day, but they "[i]gnored [him]." Suppl. Questionnaire 10–12; Questionnaire 32.

Based on the foregoing, Williams alleges that Defendants engaged in a conspiracy. Compl. 6; Questionnaire 1, 30, 32; Suppl. Questionnaire 3–6. Further, Williams classifies Defendants'

---

[5] Williams alleges either before or after Officer Espino left his post, "an offender who worked . . . directly for Lt. Caudillo, entered the wing and yelled, 'Hey, Lt. Caudillo said he snitched on the homie and her.'" *Compare* Questionnaire 32 (alleging the offender made this statement "*after* Espino walked off the wing" (emphasis added)), *with* Suppl. Questionnaire 7 ("As soon as [Williams] entered the wing and [Espino] heard the inmate accuse [Williams] of . . . snitching on Lt. Caudillo, Espino left the wing . . . .").

alleged actions as retaliatory, which he believes is the result of the grievance he filed against Lt. Caudillo on October 11. *See* Questionnaire 29; Compl. 6. Williams seeks monetary damages, as well as "a Restraining order and Permanent Injunction," for the alleged constitutional violations. Compl. 6.

### B. Failure to Protect

Prison officials have a constitutional duty to protect inmates from violence at the hands of other prisoners. *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006). Prison officials must guard against current threats, as well as sufficiently imminent dangers that may cause harm in the future, but not every injury caused by another prisoner gives rise to constitutional liability. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (explaining that "not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety"); *Horton v. Cockrell*, 70 F.3d 397, 400–01 (5th Cir. 1995).

To state a viable constitutional claim for failure to protect, a plaintiff must show: (1) he was subjected to conditions posing a substantial risk of serious harm; and (2) prison officials were deliberately indifferent to his need for protection. *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995). Deliberate indifference "is an extremely high standard to meet" (*Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)), and prison officials act with such indifference only if they know an inmate faces a substantial risk of serious harm *and* they disregard that risk by failing to take reasonable measures to alleviate it. *See Farmer*, 511 U.S. at 837. Consequently, officials' failure to alleviate a risk they should have perceived, but did not, does not constitute deliberate indifference. *See id.* at 837–38. Rather, the inmate must show that the official actually knew of and disregarded the excessive risk to inmate safety. *Id.* at 837. Thus, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." *Id.* The known risk must be more than

just some level of risk and must be "excessive." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir.

2009).

1. *Any failure-to-protect claim based on the October 10, 2020, incident or subsequent attempts to house Williams and Palmer together or near each other should be dismissed.*

To the extent Williams intends to raise a failure-to-protect claim against Lt. Caudillo based

on the October 10 incident or her attempt to place Palmer and Williams in the same cell thereafter,

Williams fails to state a viable claim. According to Williams, he and Palmer "had never had any

disputes or arguments as cellmates" prior to Palmer's alleged attack. Questionnaire 28. And even

accepting as true Williams's allegation that Lt. Caudillo tried to re-house the inmates together after

the attack, Williams concedes that he refused and was not housed with Palmer again. *Id.*; Suppl.

Questionnaire 17. Under these facts, Williams's claim should be dismissed. *See, e.g.*, *Dixon v.*

*Valdez*, No. 3:11–CV–1139–D–BK, 2011 WL 4398305, at *1–2 (N.D. Tex. Aug. 4, 2011) (finding

plaintiff failed to state viable failure-to-protect claim, where plaintiff did not "allege that

[d]efendant and her staff were aware of any risk to [p]laintiff's safety prior to the November 2009

assault, or that they inferred any risk to [p]laintiff's safety"), *R. & R. adopted by* 2011 WL 4398280

(N.D. Tex. Sept. 21, 2011).

Similarly, any failure-to-protect claim based on Williams's generalized fear of being

attacked, between the October 10 and November 19 incidents, is not viable. Williams alleges that

each wing in which Defendants housed, or attempted to house, him was dangerous; however, his

fear of attack, standing alone, does not give rise to a viable constitutional claim. *See, e.g.*, *Bass v.*

*Blount*, No. 1:18CV75-RHW, 2019 WL 4197599, at *1 (S.D. Miss. Sept. 4, 2019) ("Although

Plaintiff expresses a generalized fear of gang-affiliated members, the mere threat of violence does

not by itself constitute a failure to protect."); *see also Brown v. Bufkin*, No. 1:17cv306-RHW, 2019 WL 3220002, at *4 (S.D. Miss. July 17, 2019) (reasoning that plaintiff's failure to convey "anything more than a generalized fear of gang-affiliated inmates" did not provide sufficient information to defendant such that defendant was aware of a substantial risk of serious harm).

Moreover, except for the November 19 incident discussed below, Williams does not allege any injury arising from his housing placement, either attempted or actual, during this time. *See* Questionnaire 28–32. Any failure-to-protect claim associated with this intermediate period should be dismissed on this basis as well. *See Taylor v. Dallas Cnty.*, No. 3:20-CV-3021-M-BK, 2021 WL 5774389, at *3 (N.D. Tex. Nov. 9, 2021), *R & R adopted* 2021 WL 5771216 (N.D. Tex. Dec. 6, 2021) (recommending dismissal of prisoner's failure-to-protect claim because he alleged nothing more than de minimis injury resulting from alleged attack); *see also Robinson v. Lavalais*, 331 F. App'x 282, 284 (5th Cir. 2009) (per curiam) ("Past exposure to illegal conduct, without any current, continuing adverse effects, is insufficient to establish a case or controversy for Article III purposes with respect to injunctive relief."). The undersigned therefore recommends the district judge dismiss any claim based upon Williams's generalized fear of harm between October 10 and November 19. *See Anderson v. Wilkinson*, 440 F. App'x 379, 381 (5th Cir. 2011) (per curiam) ("We have declined to find deliberate indifference where an official *should have* inferred a risk posed to an inmate, requiring proof that the official *did* draw such an inference." (internal quotation marks and citation omitted)); *Tabor v. Hooper*, No. 20-443-SDD-EWD, 2021 WL 4144324, at *3 (M.D. La. Aug. 19, 2021) ("Deliberate indifference requires a level of awareness of a specific risk based upon specific information, such that general knowledge of general dangerousness or the like is not enough to support a failure to protect claim."), *R. & R. adopted by* 2021 WL 4139143 (M.D. La. Sept. 10, 2021).

2. *Williams has pleaded sufficient facts to survive preliminary screening as to his failure-to-protect claim surrounding the November 19 incident as alleged against Defendants Captain Aynes, Lt. Caudillo, and Officer Espino. As to Clerk Caudillo, however, Williams's failure-to-protect claim should be dismissed.*

Williams avers that Captain Aynes was aware that inmates associated with Lt. Caudillo and "allied with Palmer's friends" had made physical threats to Williams. *See* Suppl. Questionnaire 1, 5; Questionnaire 29–30. Nevertheless, on November 19, 2020, "Captain Aynes ordered [Williams] to . . . move to G-Wing, which was a disciplinary wing" and "house[d] gangbangers who were affiliated with Palmer and Caudillo." Questionnaire 32; Suppl. Questionnaire 17. Williams claims he "begged and pleaded not to be housed there out of fear for [his] life[, but] [t]o no avail." Suppl. Questionnaire 17.

Williams alleges that as soon as he arrived on the wing, Officer Espino "left his duty post in G-wing, leaving [Williams] in the dayroom with Palmer's friends." Questionnaire 32. According to Williams, "Officer Espino could only have left his duty post leaving disciplinary offenders unattended with permission of Captain Aynes and/or Lt. Caudillo." Suppl. Questionnaire 7. Williams claims an inmate "who worked out in the hallway directly for Lt. Caudillo then entered the wing and yelled, 'Hey. Lt. Caudillo said [Williams] snitched on the homie and her.'" Questionnaire 32. "Palmer's friends" then allegedly attacked Williams, beating him "with fists and feet." Suppl. Questionnaire 9. Williams alleges he "escape[d] from the assault" and as he exited the wing, Officer Espino was "just outside of the door to the wing" smiling. *Id.* at 7, 10; *see* Questionnaire 32. Officer Espino then purportedly "walked back into the wing." Suppl. Questionnaire 7. As a result of the attack, Williams contends he suffered injuries to his head, jaw, and ribs, and the inmates stole his personal property. *Id.* at 9.

Williams posits that Lt. Caudillo, Captain Aynes, and Officer Espino all failed to protect him from the assault in G-wing, with: (1) Lt. Caudillo directing the move and "employing" the

gang members; (2) Captain Aynes physically moving Williams despite Williams's protest and verbalized fears of harm; and (3) Officer Espino leaving his duty post.[6] Questionnaire 32; Suppl. Questionnaire 3–6; *see also* Suppl. Questionnaire 6, 15 (alleging that Lt. Caudillo supplied the gang members "contraband"). In Williams's view, none of the housing assignments he received adequately protected him from gang members and/or Palmer's associates, despite the fact he had "requested a transfer" to a "protective wing pending transfer to another prison unit."[7] Suppl. Questionnaire 16–17.

As to Clerk Caudillo, other than a passing reference to her involvement in a conspiracy "to move [Williams] to G-wing" (a claim the Court addresses in Section II.G. below), Williams pleads no specific facts demonstrating her involvement in the November 19 incident. *See* Questionnaire 32; Suppl. Questionnaire 5–6. Indeed, Williams never directly contends that Clerk Caudillo was responsible for his assignment to the G-wing, nor do his allegations provide facts showing Clerk Caudillo *knew* of a substantial risk of serious harm and actually drew the inference. *See* Questionnaire 32; Suppl. Questionnaire 5–6. Because Williams has failed to demonstrate that

---

[6] The mere abandonment of a duty post does not state a failure-to-protect claim but is instead more accurately framed as a negligence claim. *See Mitchell v. Wilkinson*, 193 F. App'x 372, 373 (5th Cir. 2006); *Dennis v. Crites*, No. C–12–129, 2013 WL 1681446, at *7 (S.D. Tex. Apr. 16, 2013). However, when read in conjunction with Williams's other allegations—i.e., that Officer Espino acted at the direction of Lt. Caudillo and only left his post for the duration of the purported attack, smiling upon his return—the Court finds Williams has pleaded sufficient facts.

[7] Williams concedes in his pleadings that TDCJ officials, including certain Defendants, moved him to various cells and wings in response to his life-endangerment reports. Questionnaire 29–32 (documenting at least six moves over an approximate one-month span); *see* Suppl. Questionnaire 16–17. But Williams also contends that the network of gang members, who were housed throughout the Smith Unit and who purportedly had a relationship with Lt. Caudillo, made those housing assignments unsafe, which Defendants knew. Suppl. Questionnaire 2–9, 16–17; Questionnaire 28–32. Accepting these allegations as true, the Court finds that Williams's pleadings as a whole state facts sufficient to survive screening. *See Barber v. Quarterman*, 437 F. App'x 302, 304 (5th Cir. 2011) (per curiam); *cf. Cook v. Ambriz*, No. C-08-379, 2009 WL 10705230, at *4 (S.D. Tex. June 11, 2009) (finding plaintiff had failed to state a failure-to-protect claim against defendants, where although defendants did not immediately transfer plaintiff to another unit or give him "safe-keeping status," they took steps to protect him by placing plaintiff in a single cell), *R. & R. adopted by* 2009 WL 10705233 (Aug. 21, 2009).

Clerk Caudillo was deliberately indifferent by assigning him to the G-wing, the undersigned recommends dismissal of any failure-to-protect claim against her.

In regard to Captain Aynes, Officer Espino, and Lt. Caudillo, however, the undersigned finds that at this stage, where the Court must accept a plaintiff's allegations as true, Williams has pleaded sufficient facts to allege a claim that they were intentionally indifferent to his safety or need for protection.[8] *See Edmond v. Eaves*, 70 F. App'x 159, 160 (5th Cir. 2003) (per curiam) (reversing district court's dismissal at screening of plaintiff's failure-to-protect claim, where plaintiff "alleged that the former students/gang members . . . had threatened his safety . . . ; that he communicated these threats . . . ; that his repeated requests to be transferred to another unit . . . were denied; and that he thereafter was assaulted by a gang member"); *Dennis*, 2013 WL 1681446, at *6 (denying defendant's summary judgment motion on issue of qualified immunity, where plaintiff demonstrated that "he reported numerous threats from members" of a gang and "specifically spoke to defendant . . . regarding these threats," but defendant nevertheless housed plaintiff in general population "with other gang members"); *Brown v. Armendariz*, No. 3:07–CV–2154–O (BH), 2009 WL 812149, at *8 (N.D. Tex. Mar. 26, 2009) (observing that "an alleged absence of reason-able [sic] safety measures to protect an inmate from other inmates," "a failure to transfer an inmate after he has received threats to his safety and requested a transfer," or "a transfer of an inmate into an unsafe environment" may all form the basis of a failure-to-protect claim against defendants actually involved in any transfer or lack thereof). The undersigned

---

[8] The Court acknowledges the recommendation that Lt. Caudillo be required to answer is a close call. Williams generally contends, however, that Lt. Caudillo knew his placement in G-wing constituted a serious risk of substantial harm in part because she informed the inmates about the grievance Williams filed. *See, e.g.*, Suppl. Questionnaire 5 (alleging his attackers were Lt. "Caudillo's goons"), 6 (claiming Lt. Caudillo "employed" the inmates to attack Williams and that she "revealed" Williams's grievance filing); *cf. Adames v. Perez*, 331 F.3d 508, 514 (5th Cir. 2003) (providing that plaintiff, who had divulged information to defendant about plaintiff's gang, "had to show that [defendant] was aware of facts that could lead him to infer that [plaintiff's] gang members had learned about the conversation between" defendant and plaintiff-informant). Accepting these assertions as true is sufficient, at the screening state, to state a viable claim.

therefore recommends that the district judge order Captain Aynes, Officer Espino, Lt. Caudillo, and Clerk Caudillo to answer or otherwise plead to Williams's failure-to-protect claim based on the November 19, 2020, incident.

      *3.  Any claim Williams asserts against Major Dyer, Assistant Warden Parker, Senior Warden Webb, and Director Lumpkin—all supervisory officials—should be dismissed.*

Williams generally avers that the supervisory Defendants, including Major Dyer, Assistant Warden Parker, Senior Warden Webb, and Director Lumpkin, failed to take appropriate measures to ensure his safety and prevent the November 19 assault. Questionnaire 18–21 (claiming Defendants ignored his pleas for help), 31–32. Without providing specific facts, Williams states that "[b]etween October 11, 2020 and November 19, 2020, [he] wrote multiple letters requesting protection to Senior Warden Jimmy Webb, Assistant Warden Cody Parker, Major Dyer, [and] Director Bobby Lumpkin." *Id.* at 32. More specifically, but without supporting details, Williams also asserts that on November 10, he "attempted to speak with defendant Warden Cody [sic] Parker, . . . [and] told Parker [Williams's] life was in danger." *Id.* at 31. According to Williams, however, Assistant Warden Parker "told [Williams] he had no time to deal with it" and "walked off." *Id.* The only other facts Williams alleges against any of the foregoing Defendants is that Major Dyer "had [Williams] moved to F-Wing" in response to Williams's family member's life endangerment report. *Id.* at 30.

      Williams has wholly failed to plead sufficient facts supporting a failure-to-protect claim against the supervisory Defendants. Williams's bald allegations that he sent "multiple letters requesting protection to" the supervisory Defendants and that he tried to talk with Assistant Warden Parker do not demonstrate that Defendants were aware of a substantial risk of harm and that they actually drew the inference. *Farmer*, 511 U.S. at 837. That is, "to state a valid failure-to-protect claim, [Williams] must allege the [supervisory Defendants] . . . *knew* of a substantial

risk of serious harm and failed to act." *Vela v. Garcia*, 728 F. App'x 285, 287 (5th Cir. 2018) (per curiam). Williams's pleadings do not meet this high standard. *See, e.g., id.* (explaining that prisoner's failure "to allege [defendants] were aware of facts from which the inference could be drawn that [prisoner] was exposed to a substantial risk of serious harm" was fatal to his failure-to-protect claim); *Smith v. Jaramillo*, No. SA-05-CA-0713 NN, 2006 WL 1984345, at *4 (W.D. Tex. July 13, 2006) (dismissing prisoner's failure-to-protect claim based on "generic complaints and speculations that defendants . . . *personally knew or should have known* that he would be assaulted by a" gang member).

Ultimately, Williams's claims against Major Dyer, Assistant Warden Parker, Senior Warden Webb, and Director Lumpkin are more accurately framed as an attempt to establish supervisory liability. *See* Questionnaire 16–21. It is well established that supervisory officials are not liable for the acts of their subordinates unless: (1) they affirmatively participated in an act that caused a constitutional deprivation, or (2) they implemented an unconstitutional policy that resulted in injury to the plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)). A prisoner must sufficiently allege facts showing either personal involvement or implementation of an unconstitutional policy to make a supervisor responsible under § 1983, as prison supervisors "are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins*, 828 F.2d at 303.

Because § 1983 does not permit a theory of liability premised on respondeat superior, the mere fact that Defendants may supervise Smith Unit personnel does not give rise to a viable claim. *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) ("Section 1983 does not create supervisory or respondeat superior liability."); *Thompkins*, 828 F.2d at 303 ("Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious

liability."). And as discussed above, to the extent Williams alleges Defendants were personally

involved in a constitutional violation because he contacted them via "letter," Williams also has not

pleaded facts establishing constitutional liability. *Cf. Ray v. Wilson*, No. 5:16-CV-00115-RWS,

2018 WL 1870155, at \*3 (E.D. Tex. Apr. 19, 2018) (overruling prisoner's objection and dismissing

prisoner's claim that defendant knew of a substantial risk of harm based on information in

grievance). In sum, Williams has failed to establish the requisite personal involvement.

For these reasons, the undersigned recommends dismissal of Williams's claims against

Major Dyer, Assistant Warden Parker, Senior Warden Webb, and Director Lumpkin.

## C. **Williams cannot state a cognizable constitutional claim against any Defendant based on his alleged loss of personal property.**

Williams reports that during the November 19, 2020, incident, the attacking inmates stole

his personal property, including a "[f]an, radio, books and religious items, boots and shoes,

commissary items, personal pictures, family pictures, letters, [and] misc[ellanous] items." Suppl.

Questionnaire 9; Questionnaire 32.

Any claim against the inmates based on the purported taking of personal property is without

merit. To state a viable § 1983 claim, a plaintiff must demonstrate that the defendant acted under

color of state law when depriving him of a constitutional right. *See* 42 U.S.C. § 1983; *West v.*

*Adkins*, 487 U.S. 42, 48 (1988). In certain circumstances, a private party's conduct may constitute

state action, including when: (1) the party performs a function traditionally within the exclusive

province of the state; (2) the state exercised coercive power over the party such that the conduct is

deemed that of the state; or (3) the party conspired with a state actor. *See Richard v. Hoechst*

*Celanese Chem. Grp., Inc.*, 355 F.3d 345, 352 (5th Cir. 2003).

Williams makes vague references to the inmates—i.e., private, non-state actors—being Lt.

Caudillo's "goons" or otherwise employed by Caudillo (Suppl. Questionnaire 5, 6, 15), but he

never directly contends that the inmates conspired with Lt. Caudillo. The undersigned finds that, based on the facts alleged, the inmates' taking of Williams's personal property does not constitute state action. Thus, Williams cannot state a viable § 1983 claim against them.

Even if the inmates' taking could fairly constitute state action, however, Williams cannot state a viable claim. An official's actions—whether negligent or intentional—that result in a loss of property constitute a state tort action rather than a federal civil rights claim. Indeed, a state actor's negligence that results in an unintentional loss of property does not violate the Constitution. *See Simmons v. Poppell*, 837 F.2d 1243, 1244 (5th Cir. 1988). Similarly, an intentional deprivation of personal property does not give rise to a viable constitutional claim as long as the prisoner has access to an adequate post-deprivation state remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Stauffer v. Gearhart*, 741 F.3d 574, 583 (5th Cir. 2014) (citing several cases for support) ("An inmate's allegation that his personal property was lost, confiscated, or damaged does not state a claim under 42 U.S.C. § 1983, even when prison officials acted intentionally.").

Here, Texas substantive law provides an adequate post-deprivation remedy for persons asserting claims such as those raised herein by Williams—pursuing a conversion claim in state court. *See, e.g.*, *Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994). Assuming, without finding, that the inmates, or any other person, stole Williams's property as alleged, Williams may have a cause of action in state court; however, he cannot pursue a federal constitutional claim. *DeMarco v. Davis*, 914 F.3d 383, 387 (5th Cir. 2019) (affirming dismissal of prisoner's claim that defendant seized his religious materials in violation of TDCJ policy because "Texas's tort of conversion provides an adequate post-deprivation remedy for prisoners claiming loss of property without due process"); *see Thompson v. Steele*, 709 F.2d 381, 383 (5th Cir. 1983).

For these reasons, the undersigned recommends that the district judge dismiss Williams's claim based on the alleged wrongful taking of his personal property.

**D. Any allegation based on Defendants' purported mishandling of the OPI reports does not rise to the level of a constitutional violation.**

Throughout his questionnaire responses, Williams references Defendants' purported failure to follow TDCJ policy regarding OPI investigations. *See, e.g.*, Questionnaire 22, 30–31. He also contends that Defendants falsified OPI reports by, inter alia, incorrectly stating that Williams "refused to cooperate" in the investigation. *Id.* at 22, 30, 32.

In the Fifth Circuit, the law "is clear . . . that a prison official's failure to follow the prison's own policies, procedures or regulations does not," standing alone, amount to a due process violation. *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996). Thus, any claim based on Defendants' alleged failure to follow TDCJ policy should be dismissed.

Moreover, Williams's allegation that Defendants falsified information in the OPI reports does not, standing alone, amount to a constitutional violation. In effect, Williams alleges that the false reports resulted in his not being housed appropriately or transferred to another unit. *See* Suppl. Questionnaire 16. But "the Due Process Clause does not, by itself, confer a protected liberty interest in the location of [a prisoner's] confinement, and a prisoner has no constitutional right to be housed in a particular facility." *Barber*, 437 F. App'x at 304 (internal citations omitted) (affirming dismissal of prisoner's claim "that officials falsified a report in violation of his right to due process"). The undersigned therefore recommends dismissal of Williams's claims based on purported violations of TDCJ policy and falsified OPI reports.

**E. Williams has not stated a viable due process claim regarding the allegedly false disciplinary cases.**

Williams asserts that on two occasions, Defendants falsely charged him with disciplinary infractions.[9] As to the first incident, Williams acknowledges that on October 29, 2020, Lt. Caudillo ordered him to move cells. Questionnaire 30. But Williams alleges that a few days prior, Captain Aynes had "ordered [Williams] not to move from the OPI cell" other than at the direction of Captain Aynes. *Id.* It was on this basis that Williams claims he declined to move cells. *Id.* In response to his refusal to move, however, Williams contends that "Lt. Caudillo ordered Sgt. Sanchez to write [Williams] two disciplinary cases just minutes apart." *Id.*

Williams states that he appeared at a hearing regarding the disciplinary infractions on November 5, but Captain Henry "refused to allow [Williams] to call Captain Aynes as a witness, and [Henry] refused to take [Williams's] statement." *Id.* at 31. The authenticated records show, and Williams agrees, that Captain Henry found him guilty as to both disciplinary charges and punished Williams with a loss of forty-five days recreation, commissary, and phone time privileges, as well as reduced Williams's line class. *Id.* at 24, 31.

The second false-disciplinary claim arises out of a November 17, 2020, incident. *Id.* at 31. Williams alleges that acting at the direction of Lt. Caudillo, "Sgt. Atkinson fabricated two disciplinary cases against [him] falsely claiming [Williams] was on 'C-Wing' and that [Williams] refused to move by telling [Atkinson], 'You can't make me.'" *Id.* Specifically, the records show that Sgt. Atkinson charged Williams for failing to obey an order and being in a location Williams was not authorized to be. *Id.* at 26. At a December 15 hearing, an officer found Williams guilty as to both infractions. *Id.* As to the failure-to-obey charge, the records show Williams lost forty

---

[9] To the extent Williams asserts that the disciplinary charges were retaliatory (Questionnaire 25, 26), the Court addresses his claims in Section II.F. below.

days of recreation and commissary time, thirty days of good time credit, and his line class was reduced. *Id.* For the unauthorized location charge, the records reflect that Williams was punished with a loss of forty-five days recreation and commissary privileges, sixty days of property privileges, and thirty days of good time credit. *Id.* His line class was also reduced. *Id.*

Williams avers that he appealed all of the foregoing disciplinary charges but alleges no facts stating that they were overturned. *Id.* at 24, 26.

    *1. The October 29, 2020, disciplinary charges.*

Initially, the Court observes that although Williams describes the disciplinary infractions as "false," he concedes that he did not obey Lt. Caudillo's orders, regardless of any justification he may have for doing so. *Id.* at 30. Williams does not have a constitutional right to disobey an officer's orders. *See, e.g., Minix v. Blevins*, No. 6:06cv306, 2007 WL 1217883, at *24 (E.D. Tex. Apr. 23, 2007) (recognizing that even where prisoner believes an order to be unjustified or improper, such belief does not give him the right to disobey at his whim). Standing alone, his allegation that the disciplinary infractions were unlawful does not state a claim.

Moreover, Williams acknowledges that he received a disciplinary hearing concerning the infractions. Questionnaire 31. Williams takes issue with the way Captain Henry conducted the hearing—i.e., failing to call Captain Aynes as a witness and rejecting Williams's defense. *Id.* But ultimately, Williams did not suffer the loss of a liberty interest such that his claim implicates the Due Process Clause. *See Sandin v. Connor*, 515 U.S. 472, 484 (1995) (explaining that where the deprivation of a constitutional right imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," a prisoner may state a viable due process claim); *Madison v. Parker*, 104 F.3d 765, 767–68 (5th Cir. 1997) (holding that prisoner's loss of "30 day commissary and cell restrictions" were "merely changes in the conditions of his confinement and

[did] not implicate due process concerns," even where prisoner alleged defendant "denied due process at his disciplinary hearing in that he was refused the opportunity to present witnesses and offer documentary evidence").

   *2. The November 17, 2020, disciplinary charges.*

   In *Heck v. Humphrey*, the United States Supreme Court held that a plaintiff seeking to recover damages for harm "caused by actions whose unlawfulness would render a conviction or sentence invalid" must first prove that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 486–87 (1994).   Where a favorable judgment in the civil rights action would "necessarily imply the invalidity of [a prisoner's] conviction or sentence" in his criminal case, the civil claim is barred unless the criminal conviction has been reversed or otherwise declared invalid. *Id.*   In addition to actions for monetary damages, courts have subsequently applied the "*Heck* bar" to prisoners' claims for injunctive and declaratory relief.   *Reger v. Walker*, 312 F. App'x 624, 625 (5th Cir. 2009) (per curiam) (noting that whether a plaintiff's claims are "for damages, declaratory judgment, or injunctive relief," they are not cognizable under § 1983 until plaintiff's conviction is overturned or otherwise declared invalid).   Courts have similarly extended *Heck* to § 1983 claims that would imply the invalidity of prison disciplinary convictions. *See, e.g.*, *Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (applying "*Heck* bar" to prisoner's §1983 claim for monetary damages arising out of discipline imposed due to alleged deceit and bias of penitentiary's decision maker, and concluding claim was not cognizable).

   Williams lost good-time credit as a result of the November 17 disciplinary infractions. Questionnaire 26.   Further, Williams does not plead any facts indicating that the guilty findings

were overturned or otherwise invalidated. *Id.* Accordingly, the undersigned concludes any due process claim based on the alleged false disciplinaries is *Heck*-barred. *See, e.g.*, *Taylor v. Gunnels*, 378 F. App'x 469, 470 (5th Cir. 2010) (per curiam) (affirming dismissal as *Heck*-barred of prisoner's false-disciplinary claim, which "necessarily impl[ied] that the finding of guilt and the punishment for the violation were invalid" but prisoner had "not shown that the disciplinary decision has been overturned"); *Clarke v. Stalder*, 154 F.3d 186, 189 (5th Cir. 1998) (explaining that a prisoner cannot bring a § 1983 action seeking damages "based on a 'conviction' until that 'conviction' has been reversed . . . or otherwise declared invalid," and defining a conviction to include "a ruling in a prison disciplinary proceeding that results in a change to the prisoner's sentence, including the loss of good-time credits").

### F. Retaliation

Williams generally describes all of Defendants' purported actions as retaliatory. Compl. 6. Williams contends that the retaliation began after he filed a grievance on October 11, 2020, concerning Lt. Caudillo's attempt to re-house Palmer with Williams.[10] Questionnaire 29.

A plaintiff must demonstrate the following to establish an actionable claim for retaliation: "(1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation." *Freeman v. Tex. Dep't of Crim. Just.*, 369 F.3d 854, 863 (5th Cir. 2004) (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th

---

[10] In conclusory fashion, Williams also complains that "[t]he Smith Unit ECB grievance process was unavailable based on the threats, intimidation, retaliation for using the process and the grievances disappearing without ever being returned with a response." Questionnaire 32. To the extent Williams attempts to assert a constitutional violation based on the foregoing, his claim fails. First, Williams does not attribute the purported misconduct to a particular actor. Moreover, Williams has no constitutional right to have grievances adequately investigated or resolved to his satisfaction. For these reasons, Williams fails to state a claim. *See Morris v. Cross*, 476 F. App'x 783, 785 (5th Cir. 2012) (per curiam) (rejecting appellant's claim that prison official's failure to conduct an adequate investigation into his grievance implicated due process concerns "because [appellant] lacks a protected interest in a favorable resolution to his grievances"); *Sias v. Louisiana*, 146 F. App'x 719, 720 (5th Cir. 2005) (per curiam) (holding that vague and conclusory allegations provide an insufficient basis for § 1983 claims).

Cir. 1995)). Conclusory allegations, including a prisoner's personal belief that he is the victim of retaliation, are insufficient to support a claim for retaliation. *Jones v. Greninger*, 188 F.3d at 325 (citing *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)). Instead, "'[t]he inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.'" *Haddix v. Kerss*, 203 F. App'x 551, 554 (5th Cir. 2006) (per curiam) (quoting *Woods*, 60 F.3d at 1166). In evaluating such claims, the Fifth Circuit has cautioned that "prisoners' claims of retaliation are regarded with skepticism" and should be "carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (per curiam) (citing *Woods*, 60 F.3d at 1166).

At the outset, the Court notes that the filing of a non-frivolous grievance can be a constitutionally protected activity. *Gonzales v. Gross*, 779 F. App'x 227, 230 (5th Cir. 2019) (per curiam) (quoting *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018)).

*1. Disciplinary Infractions*

Williams asserts that Sgts. Sanchez and Atkinson, acting at Lt. Caudillo's direction, issued false disciplinary cases against Williams. Questionnaire 30–31. Notably, Williams does not name Sgts. Sanchez and Atkinson as defendants. Compl. 4–5. Moreover, other than a conclusory claim that Lt. Caudillo ordered Sgts. Sanchez and Atkinson to issue the disciplinary cases, Williams pleads no facts demonstrating a connection between the individuals. Questionnaire 30–31; *see id.* at 24–27 (asking Williams to specifically describe all facts forming the bases of his disciplinary retaliation claims and his believed reason(s) for the retaliation).

Regarding the October 29 disciplinaries, as discussed in Section II.E. above, Williams concedes that he did not obey Lt. Caudillo's orders to move cells. *Id.* at 30. Williams attempts to justify his non-compliance, alleging that Captain Aynes directed Williams not to move other than

upon an order from Aynes. *Id.* Williams also states that Lt. Caudillo ordered him to move from "the OPI cell" the day after "the TDCJ Ombudsman's office" closed an OPI investigation.[11] *Id.* That is, Williams pleads no facts demonstrating that the disciplinary infractions would not have issued but for Lt. Caudillo's or Sgt. Sanchez's retaliatory motive. *See Lee v. Richland Par. Det. Ctr.*, No. 3:11-cv-0925, 2011 WL 6057859, at *10 (W.D. La. Oct. 25, 2011) (recommending dismissal of plaintiff's retaliation claim, where plaintiff failed to demonstrate that but for his exercise of a constitutional right, the alleged retaliatory act would not have occurred), *R. & R. adopted by* 2011 WL 6097731 (W.D. La. Dec. 6, 2011), *aff'd*, 483 F. App'x 904 (5th Cir. 2012).

Turning to the November 17 disciplinary infractions, Williams has likewise failed to state a plausible retaliation claim. Williams again bases his allegation on conclusory statements: that Sgt. Atkinson issued the disciplinaries at Lt. Caudillo's direction. Questionnaire 31. But despite asking Williams to specifically explain the basis of his belief, he provided no details to support his general statement. *See id.* at 26–27. That is, Williams does not allege facts showing how Sgt. Atkinson and Lt. Caudillo were connected; Sgt. Atkinson's purported motivation; how Williams knows that Sgt. Atkinson acted on an order from Lt. Caudillo; or why he believes the disciplinary charges were "false" and retaliatory. Williams must assert more than a personal belief he is the victim of retaliation; he has not done so. *See, e.g., Russie v. Davis*, No. 2:17-CV-225-Z-BR, 2020 WL 6550502, at *3 (N.D. Tex. Nov. 5, 2020) (dismissing prisoner's retaliation claim in part because he had not pleaded facts showing a connection between the false disciplinary issued by defendant and defendant's alleged attempted recruitment of prisoner to a prison gang); *Rice v. Oliver*, No. 9:09cv120, 2012 WL 219500, at *7 (E.D. Tex. Jan. 23, 2012) (concluding prisoner

---

[11] Williams seemingly disputes the TDCJ Ombudman's OPI findings. Questionnaire 30. Regardless, the chronology of events pleaded by Williams suggests a plausible, non-retaliatory reason for the move—that after the OPI investigation was closed, Williams no longer needed to be housed in "the OPI cell."

had not stated meritorious retaliation claim, where he merely alleged that defendants retaliated because prisoner had filed grievances against them—an allegation that was conclusory at best).

*2. Falsified OPI Report and Assault of Williams*

According to Williams, Lt. Caudillo falsified an October 19, 2020, OPI report by stating that Williams refused to cooperate with the investigation.[12]  Questionnaire 22.  Williams denies that he refused to participate.  *Id.*  Liberally construing his pleadings, Williams contends that but for Lt. Caudillo's false statement, he would have been granted protection, and ultimately, the falsification "resulted in [his] being physically assaulted by gang members working in [sic] [Lt. Caudillo's] behalf" one month later.[13]  *Id.* at 23.

Further, Williams avers that the assault itself was the result of Defendants' apparent retaliation.  Compl. 6.  Other than his conclusory label that all Defendants acted in retaliation, Williams pleads no specific facts supporting his allegations.  *See id.* at 4–6; Questionnaire 3–21.  Specifically, Williams fails to plead facts showing that Defendants, excepting Lt. Caudillo, acted with retaliatory motive.  *See* Compl. 4–6; Questionnaire 3–21.  For example, Williams does not explain why Defendants would have retaliated based on a grievance Williams filed against Lt. Caudillo,[14] nor does Williams even contend that Defendants were aware of the grievance.  Thus, any retaliation claim based on the assault against any Defendant other than Lt. Caudillo should be dismissed.  *See, e.g.*, *Allen v. Jones*, 458 F. App'x 408, 410 (5th Cir. 2012) (per curiam) (affirming

---

[12] Williams concedes that he has never seen the OPI report. Questionnaire 22. But "the TDCJ Ombudsman's office" ostensibly sent a "letter claiming that [Williams] had refused to cooperate with the OPI investigation." *Id.* at 30.

[13] Williams vaguely claims that other OPI reports and personal safety investigations were either wrong or falsified. *See* Questionnaire 31–32. But he does not specifically allege any facts demonstrating that Defendants were involved. *See id.* His conclusory allegations in this regard fail to state a claim, and the undersigned finds the only viable claim is one against Lt. Caudillo. *See Sias*, 146 F. App'x at 720.

[14] Williams makes only the general assertion that Defendants acted based on an alleged "loyalty to [Lt. Caudillo], the culture of retaliation, and/or their fear of Lt. Caudillo because of her rank." Suppl. Questionnaire 6. Williams, however, pleads no facts supporting these conclusory statements.

award of summary judgment on prisoner's retaliation claim, where prisoner merely alleged personal belief he was a victim of retaliation and did not aver that defendant was personally aware of constitutionally protected activity in which prisoner engaged); *Bilbrew v. Johnson*, 239 F. App'x 49, 51 (5th Cir. 2007) (per curiam) (stating that prisoner's allegation that "prison officials retaliated against him for his use of the prison grievance system" was "based on his own personal beliefs" and therefore did not state actionable retaliation claim); *Shackelford v. State Bar of Tex.*, No. 3:19-CV-1075-M-BN, 2019 WL 4418277, at *3 (N.D. Tex. Aug. 20, 2019) (stating that "while a court must accept all of a plaintiff's allegations as true, it is 'not bound to accept as true a legal conclusion couched as a factual allegation'"), *R. & R. adopted by* 2019 WL 4413288 (N.D. Tex. Sept. 16, 2019).

As to Lt. Caudillo's purported retaliation, however, the undersigned recommends the district judge require her to file an answer or otherwise plead. Williams asserts that after he filed a grievance against Lt. Caudillo, he "was subjected to adverse actions, and Lt. Caudillo told [him] it was because [he] didn't 'keep [his] mouth shut' about Palmer's assault." Suppl. Questionnaire 3. Further, Williams alleges that "[p]rior to filing the grievance, [he] had no problems with staff and [he] worked for the building Major." *Id.* Williams contends that the adverse actions—allegedly making a false statement in the OPI report and enlisting other inmates to assault Williams—resulted in physical harm, which would not have occurred but for the grievance filing. Questionnaire 22–23. At this stage, viewing facts in a light most favorable to Williams, the undersigned finds Williams has pleaded sufficient facts to survive screening. *See, e.g., Hope v. Harris*, 861 F. App'x 571, 581–82 (5th Cir. 2021) (vacating district court's dismissal of prisoner's retaliation claim, concluding prisoner's contention that he was subjected to excessive cell-transfers and confiscation of his typewriter only after he filed a grievance demonstrated a chronology of

events from retaliation could be inferred); *Gonzales*, 779 F. App'x at 230 (reversing district court's dismissal of prisoner's retaliation claim, explaining prisoner's allegation that defendant placed a security code on his classification the same day prisoner filed grievance against defendant sufficiently demonstrated "but for" causation).

### G. Conspiracy

"To establish a conspiracy claim under § 1983, the plaintiff must show that there was an agreement among the alleged co-conspirators to deprive him of his constitutional rights and that such an alleged deprivation actually occurred." *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019). "Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983." *Id.*; *Lynch v. Cannatella*, 810 F.2d 1363, 1369–70 (5th Cir. 1987) ("Plaintiffs who assert conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based. Bald allegations that a conspiracy existed are insufficient."); *Chadman v. Quisenberry*, No. 4:17-CV-700-Y, 2019 WL 3530422, at *6 (N.D. Tex. Aug. 2, 2019) ("Conspiracy claims under § 1983 require that the claimant relate specific facts."). "Therefore, to establish his conspiracy claim, [plaintiff] must plead specific, nonconclusory facts that establish that there was an agreement among the defendants to violate his federal civil rights." *Montgomery*, 759 F. App'x at 314.

Williams alleges that Defendants conspired: (1) "to retaliate by taking disciplinary actions against [him]"; (2) "by falsifying [OPI] reports"; (3) "by employing gangmembers [sic] to assault [him] and steal his property"; and (4) "by failing to protect [him]." Compl. 6; *see also* Questionnaire 1 (asserting that all named Defendants conspired against him). Williams pleads no facts, however, demonstrating that Defendants entered into an agreement to violate his

constitutional rights. The Court asked Williams to "[d]escribe all facts forming the basis of [his] belief that Defendants entered into an agreement to conspire." Questionnaire 2. Williams responded, "The answer is contained in the attached declaration . . . ." *Id.* The declaration, however, only makes conclusory references to a purported conspiracy. *Id.* at 28–33. Williams does not assert any specific facts demonstrating a meeting of the minds between Defendants. *Id.* (claiming that Defendants all had some role in assigning Williams's housing or that Williams otherwise informed Defendants of the fears for his safety, but failing to allege facts connecting the parties). Thus, the undersigned recommends dismissal of Williams's conspiracy claim. *See Tebo v. Tebo*, 550 F.3d 492, 497 (5th Cir. 2008) (affirming district court's grant of summary judgment on plaintiff's conspiracy claim, where plaintiff alleged no facts showing defendants acted in agreement to commit an illegal act); *Blakely v. Andrade*, 360 F. Supp. 3d 453, 490 (N.D. Tex. 2019) (recommending dismissal at screening on plaintiff's conspiracy claim, where did not demonstrate defendants agreed to commit an unlawful act).

### H. Williams has pleaded sufficient facts to survive screening concerning his deliberate indifference to serious medical needs claims against Lt. Caudillo and Captain Aynes.

The Constitution requires that prison officials provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate or detainee seeking to establish a Fourteenth Amendment violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). Deliberate indifference "is an extremely high standard to meet" (*Brewster*, 587 F.3d at 770 (internal quotation marks and citation omitted)) and requires satisfaction of both an

objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). As to the subjective component, an official acts with deliberate indifference only where he (1) "knows [the] inmate[] face[s] a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (alterations and internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*,

989 F.2d 191, 193 (5th Cir. 1993). In sum, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

Williams asserts that following the November 19 attack, he verbally asked Lt. Caudillo and Captain Aynes for medical treatment for the injuries to his head, jaw, and ribs that same day, but they "[i]gnored [him]." Suppl. Questionnaire 10–12; Questionnaire 32. Williams avers that he stated to Lt. Caudillo and Captain Aynes that he "had been physically assaulted by numerous inmates," "suffered injuries[,] and was in pain." Suppl. Questionnaire 12. The only treatment Williams remembers receiving after the November 19 incident was related to his mental health. *Id.* at 13.

Accepting Williams's allegations as true, as the Court must at this stage, the undersigned finds he has pleaded sufficient facts regarding his claim to survive preliminary screening. *See, e.g.*, *Vinson v. Caddo Corr. Ctr.*, No. 20-1425, 2021 WL 1015851, at *2, *4 (W.D. La. Feb. 19, 2021) (finding inmate's medical care claim against nurses survived screening, where he alleged that he described his symptoms and had visible ailments, but nurses did not obtain care for him), *R. & R. adopted by* 2021 WL 982320 (W.D. La. Mar. 16, 2021); *Fountain v. Thaler*, No. 6:13cv958, 2015 WL 5168775, at *16 (E.D. Tex. Sept. 2, 2015) (finding prisoner's allegations that he "repeatedly asked [defendant] for mental health care and she . . . had him fill out forms and talked to him, but [did] not provide[] him with any care," stated a claim sufficient to require an answer). The Court therefore recommends that the district judge require Lt. Caudillo and Captain

Aynes to answer or otherwise plead to Williams's deliberate indifference to serious medical needs claim.

## III. Recommendation

For these reasons, the undersigned recommends that the United States District Judge order an answer or other pleading as to the following claims: failure-to-protect against Defendants Richard Aynes, Olivia Caudillo, and Oscar Espino; retaliation against Defendant Olivia Caudillo; and deliberate indifference to serious medical needs against Defendants Richard Aynes and Olivia Caudillo. As to the remaining claims, the undersigned recommends that the United States District Judge dismiss them with prejudice, except for Williams's claim based on a due process violation related to a November 17, 2020, disciplinary charge. As to that claim, the undersigned recommends the district judge dismiss it with prejudice until the conditions of *Heck v. Humphrey*, 512 U.S. 477 (1994) are met.

## IV. Right to Object

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that

are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: February 28, 2022.

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE